**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **PDTI HOLDINGS, LLC** | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 12-CV-281-GKF-FHM** |
| | **)** | |
| **CATOOSA TEST FACILITY, LLC** | **)** | |
| **Defendant.** | **)** | |

**DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

Defendant, Catoosa Test Facility, LLC ("CTF"), hereby moves the Court to compel arbitration and stay further proceedings in this lawsuit during the pendency of the arbitration.

## I. INTRODUCTION

In this motion, CTF seeks the enforcement of a provision in the "Standard Terms and Conditions" of the agreement between the parties that mandates the arbitration of disputes arising under the agreement.

## II. BACKGROUND FACTS

CTF successfully operates a drilling technology testing and evaluation facility originally created by Amoco Corporation to support its research and development activities in North America.[1] Amoco Corporation spun off the facility to private owners, who sold it to the current owners who moved the facility from Catoosa to Hallett, Oklahoma, where it now operates. It provides technology focused companies in the oil and gas industry with a testing environment to conduct customer-directed research and development using its on-site equipment including drilling rigs, wireline equipment, data acquisition facilities, a drilling fluids laboratory, machine shop, warehouse, welding shop and other infrastructure to

[1] See Affidavit of David Lannan, attached as Exhibit A.

support field-based research efforts. CTF has several drill pads that allow multiple well bores to be drilled from the same location for equipment testing, research and development activities.

Plaintiff, PDTI Holdings, L.L.C. ("PDTI") was one of CTF's many national and international customers. It was originally formed to develop a new drilling technology that uses small pellets of metal, rather than a conventional drill bit to drill through difficult rock formations. The supposed advantage of the technology lies in its alleged ability to penetrate hard formations more rapidly than more conventional technology could, but the actual implementation of the technology has been difficult for PDTI. It has not been financially successful, and filed bankruptcy in May 30, 2009[2]. PDTI's predecessor before bankruptcy was one of CTF's customers. Armed with fresh capital from new investors, it again decided to use the testing at CTF. CTF agreed, but reluctantly because PDTI's technology is difficult to work with. Metal pellets in drilling mud present a host of technological issues not present in ordinary drilling activities. They can interfere with drilling mud circulation, causing damage and destruction of equipment and the subsurface formations that are being drilled. Those who understand drilling technology know that the circulation of drilling mud is as important to the success, and indeed the survival of a drilling operation as is the circulation of blood in the human body to its survival. Drilling mud delivers rock cuttings to the surface, lubricates a drill bit and prevents blow outs. When a tool pusher says he has lost circulation, everyone on the rig knows danger looms.

When PDTI arrived in Hallett it was under a tight schedule to demonstrate efficacy of its technology. It hoped to obtain test results that might impress potential customers, such as Chesapeake and Devon. To impress them, PDTI ramped up the speed of the operation, but in the process became

---

[2] In Re Particle Drilling Technologies, Inc., S.D.Tx. Case No. 09-33744.

careless. PDTI's equipment failed to manage the pellets in the drilling mud. They lost circulation while attempting repairs of the equipment. Metal pellets and rock cuttings packed around the drill bit causing it to get stuck in the hole. In an attempt to regain circulation, PDTI pressured up the formation and inadvertently fracked it with the pellets, resulting in permanent damage to rock formations under the drilling pad. PDTI abandoned its testing efforts and left behind an unpaid bill in the amount of $310,258.00. After settlement negotiations failed, PDTI filed this case seeking a declaratory judgment that it does not owe CTF for either the facility rental or damages resulting from the catastrophic consequences of its failed test.

The issue for decision in this motion is jurisdictional. In the exchange of emails that defined the parties' agreement, CTF included its "Standard Terms and Conditions" (hereinafter referred to as the "Standard Terms and Conditions"). PDTI did not object at any time.[3] Paragraph 19 of the Standard Terms and Conditions[4] obligates the parties to resolve their disputes through Arbitration. It provides:

> All disputes (the "Dispute") arising out of or relating to this Agreement or the furnishing of Work hereunder shall be resolved by final and binding arbitration, as the sole and exclusive remedy of the parties as to the Dispute, conducted in accordance with the Commercial Rules of Arbitration of the American Arbitration Association (the "Rules") which are deemed to be incorporated by reference.

CTF has asked PDTI to submit this dispute to Arbitration, but PDTI has refused. Consequently, the threshold question before this Court is whether this dispute will be resolved through Arbitration under the Standard Terms and Conditions, or not.

---

[3] Affidavit of David Lannan, paragraph 5.

[4] See attached Exhibit B.

## III. ARGUMENT

### A. The Federal Arbitration Act Governs This Dispute.

PDTI's claims and CTF's counterclaims are within the scope of the Arbitration Provision of the Standard Terms and Conditions. Pursuant to Section 2 of the Federal Arbitration Act, the agreement of the parties to submit this dispute is irrevocable and enforceable:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[5]

The Federal Arbitration Act "declare[s] a national policy favoring arbitration of claims that parties contract to settle in that manner."[6] There is no dispute that the parties have an existing controversy arising out of a contract in interstate commerce, nor is there any dispute that CTF has tendered a written arbitration provision that would submit this dispute to arbitration. The parties' dispute is about whether the arbitration provision is part of their agreement. If it is, then arbitration will decide the merits of this dispute. If it is not, this Court will decide them. Initially, the threshold issue of subject matter jurisdiction is for this Court to decide.

Whether parties have agreed to arbitrate a dispute is to be determined by ordinary state-law principles. According to the Tenth Circuit:

---

[5] 9 U.S.C.A. § 2 (West).

[6] Preston v. Ferrer, 128 S. Ct. 978, 983 (2008) (citing 9 U.S.C. § 2; Southland Corp. v. Keating, 465 U.S. 1 (1984)); see also Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) ("Section 2 embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").

> Generally, courts "should apply ordinary state-law principles that govern the formation of contracts" to determine whether a party has agreed to arbitrate a dispute. *First Options*, 514 U.S. 938, at 944, 115 S.Ct. 1920, 131 L.Ed.2d 985.[7]

The document containing the Standard Terms and Conditions was not signed by the parties, but Oklahoma law does not require the contract containing an arbitration agreement to be signed, but instead allows acceptance of an offer by performance:

> In general, Oklahoma follows traditional contract principles in permitting acceptance of an offer by performance: "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal." Okla. Stat. tit. 15, § 70; *see generally* Restatement (Second) of Contracts § 19 (1981) ("The manifestation of assent may be made wholly or partly by written or spoken words *or by other acts or by failure to act.*")[8]

After PDTI received CTF's Standard Terms and Conditions, it never objected to any of them, but instead moved forward with performance under the terms of the contract. Therefore, the arbitration provision in paragraph 19 of the Standard Terms and Conditions is binding on both PDTI and CTF.

Other Federal District Courts have reached the same result in similar factual settings. In Miller-Holzwarth, Inc. v. L-3 Communications, Corp.,[9] the seller sent a proposal with standard terms and conditions that included an arbitration provision like the one in this case. It required arbitration of "any dispute, claim or controversy" arising out of Miller-Holzwarth's parts order. Although Miller-Holzwarth asserted that it never assented to the arbitration provision, the Federal District Court held:

> Furthermore, as MHI readily performed its obligations following receipt of L-3's terms and conditions, the Court finds that MHI's conduct manifested an assent to those terms and conditions. Accordingly, the arbitration clause was a part of the parties' contract.[10]

---

[7] Hardin v. First Cash Fin. Services, Inc., 465 F.3d 470, 475 (10th Cir. 2006).
[8] *Id.*, 465 F.3d 470 at 476.
[9] Miller-Holzwarth, Inc. v. L-3 Communications, Corp., 4:09CV2282, 2010 WL 2253642 (N.D. Ohio June 2, 2010).
[10] *Id*.

In Shany Co., Ltd. v. Crain Walnut Shelling, Inc.,[11] Shany sought an injunction prohibiting Crain from pursuing arbitration of a dispute arising under a walnut purchase contract. Crain sent Shany an email confirmation of the order with standard terms and conditions that included an arbitration provision. The Court determined that the arbitration provision was binding:

> Although an arbitration agreement must be in writing, it need not be signed to be enforceable if the unsigned agreement is otherwise deemed to be a contract under state law principles. *Seawright v. American Gen.'l Financial Services, Inc.*, 507 F.3d 967, 978–79 & n. 5 (6th Cir.2007) (FAA requires only a written agreement); *Jones v. Jacobson*, 195 Cal.App.4th 1, 6 n. 3, 125 Cal.Rptr.3d 522 (2011) (unsigned agreement may be enforceable); *E.O.C. Ord, Inc. v. Kovakovich*, 200 Cal.App.3d 1194, 1202, 246 Cal.Rptr. 456 (1988) (if parties accept unsigned agreement as contract, it is enforceable).[12]

**B. Consequences of the Ruling on this Motion**

This Court's decision on the enforceability of the Standard Terms and Conditions has further consequences in this case. In addition to the provision on arbitration in Paragraph 19, the Standard Terms and Conditions contain significant limitations on the extent of damages that are recoverable in disputes between the parties. Specifically, Paragraphs 12 and 13 state:

> 12. Liability:
> Company agrees to release, defend, indemnify, and hold harmless CTF, its parent, its affiliates, and directors, agents, or employees of any of them, from and against any and all loss and/or liability (including, but not limited to, attorney's fees and other litigation costs) arising out of personal injury or death, or loss of or damage to property of Company, its affiliates and directors, agents or employees of any of them, not withstanding (sic) the negligence of CTF. CTF agrees to release, defend, indemnify, and hold harmless Company, its affiliates, and directors, agents, or employees of any of them, from and against any and all loss and/or liability (including, but not limited to, attorney's fees and other litigation costs) arising out of personal injury or death, or loss of or damage to property of CTF, its parent, its affiliates and directors, agents or employees of any of them, not withstanding (sic) the negligence of Company.

[11] CIV. S-11-1112 KJM, 2012 WL 1979244 (E.D. Cal. June 1, 2012).
[12] *Id.*

> 13. Limitation of Damages:
> CTF 's liability for any claim hereunder, including claims arising under personal injury or death, loss of or damage to property, nonperformance or delay in performance of Services, or loss, damage or destruction of any materials, and whether or not based on breach of contract or negligence, shall not exceed the fees paid or to be paid hereunder in connection with the Tests and Services in respect of which such claim is made, except that CTF shall be fully responsible, without limitation, for claims covered by CTF's indemnity obligations in Section 12 above. The Parties further agree that neither party shall be liable to the other party under this Agreement for any loss of profit, special, indirect, incidental or consequential damages whether arising under warranty, contract, tort or any other cause or combination of causes whatsoever, even if such a party has been advised of the possibility of such damages.[13]

As previously stated, CTF has suffered substantial damages to the formation under its drillsite. When PDTI fracked the formations it drilled into with the steel pellets from its new technology, those formations became unusable in the vicinity of the well bore where the fracking occurred. PDTI has damaged at least twelve drill sites. CTF will have to case off and cement the fracked formations to make them usable, and there is no certainty they will ultimately be usable even if they are cased off. The total extent of the damages to CTF's facility is unknown at this point and repairs are continuing. Therefore, the total extent of indirect and consequential damages for lost profits resulting from CTF's loss of use of the drill sites is not yet known. The above provisions may either limit or eliminate CTF's recovery of those damages from PDTI. CTF has not yet filed its answer and counterclaim, but when it does, the counterclaims it has against PDTI either will or will not be limited by Paragraphs 12 and 13. The enforceability of CTF's counterclaims for these damages depends on this Court's decision on whether the Standard Terms and Conditions are a part of the agreement of the parties. Obviously, CTF's contention that they are a part of the agreement brings with it a serious and substantial risk of losing the chance of recovering substantial damages against PDTI. If CTF's contention is wrong and they are not part of the agreement, CTF intends to pursue recovery of those damages.

[13] See Exhibit B, Standard Terms and Conditions.

### C. Conclusion

This is not a "battle of the forms" case because there was no battle. Instead, before any work was done on this project, CTF emailed its Standard Terms and Conditions to PDTI, who never objected to them in any way. PDTI's performance thereafter constitutes an objective manifestation of its assent to those terms. Consequently, CTF contends they are binding on the parties, but if they are not, CTF has substantial claims against PDTI for damages to its facility and its business.

## IV. REQUESTED RELIEF

Defendant asks this Court to grant its Motion to Compel Arbitration, order the parties to arbitration and abate this lawsuit pending the outcome of the arbitration, and grant Defendant such other and further relief as may be just.

Respectfully submitted,

/s/ R. Brent Blackstock
R. Brent Blackstock – OBA No. 00839
HARTMAN, BLACKSTOCK & MOORE
P.O. Box 700690
Tulsa, Oklahoma 74170-0690
Phone No.: (918) 712-3246
Fax No.: (918) 712-5042
Brent@BrentBlackstock.com

Counsel for Defendant, Catoosa Test Facility, LLC

## CERTIFICATE OF SERVICE

I hereby certify that I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Chris M Warzecha
Scott Hathaway

/s/ R. Brent Blackstock